UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

UNITED STATES OF AMERICA,

   -  against  -

GLADYS SOTO and RAFAEL LOPEZ,

              Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CR-76 (MKB)

MARGO K. BRODIE, United States District Judge:

      Defendant Gladys Soto is charged in a four-count indictment with bulk cash smuggling, in violation of Title 31, United States Code, Section 5332(a), failure to file a report, in violation of Title 31, United States Code, Section 5316(a)(1)(A), making a false statement, in violation of Title 18, United States Code, Section 1001(a)(2), and using a false writing and document, in violation of Title 18, United States Code, Section 1001(a)(3). Currently before the Court is Soto's motion to suppress all statements allegedly made by her on January 11, 2013. A suppression hearing was held on February 26, 2014.[1] For the reasons discussed below, the Court denies Soto's motion in its entirety.

**I. Background**

    **a. Jetway examination**

      On February 26, 2014, the Court heard testimony from Gail Mathis ("Officer Mathis"), an officer with United States Customs and Border Protection ("CBP") and Richard DeLisio ("SA DeLisio"), a special agent with Homeland Security Investigations ("HSI"). (Tr. of Suppression

---

[1] Due to some confusion as to the scope of Soto's motion, the Court granted both parties leave to file supplemental letter motions and to state whether further testimony or development of the factual record were necessary. (Transcript of Suppression Hearing ("Tr."), dated Feb. 26, 2014, 75:19–76:16.) Neither party sought to introduce additional evidence.

Hr'g ("Tr."), dated Feb. 26, 2014, 4:2–11.) Based on the parties' submissions and the evidence developed at the suppression hearing, the Court makes the following findings of fact.

On January 11, 2013, Soto sought to travel from John F. Kennedy Airport in Queens, New York to Santo Domingo, Dominican Republic. (Docket Entry No. 20, Affidavit of Gladys Soto ("Soto Aff."), dated August 9, 2013, ¶ 2; Tr. 5:25–6:1.) Upon arriving at the airport, Soto checked a bag at the curbside check-in stand. (Soto Aff. ¶ 2.) During luggage screening, the Transportation Security Administration ("TSA") detected a large sum of money in Soto's bag and notified CBP of the anomaly. (Tr. 14:23–15:4.) Soto was identified as a person of interest. (*Id.* at 20:14–16.)

In response to TSA's notification, Officer Mathis set out to perform an outbound currency examination of Soto. (*Id.* at 34:3–4.) Officer Mathis and two other officers, Officer Ramirez and Officer Lopez, positioned themselves on the jetway of Soto's outbound plane; the jetway is the mobile pathway leading from the door of the airport terminal to the entrance of the plane. (*Id.* at 6:3–9.) The officers wore not in uniform and carried firearms, although their firearms were not displayed. (*Id.* at 19:1–11.)

Once boarding began, the three officers examined the passports of each passenger as they passed through the jetway. (*Id.* at 6:13–14.) Upon encountering Soto, Officer Mathis asked her to step to the side. (*Id.* at 6:19–22.) Officer Mathis identified herself and informed Soto that she would be undergoing an outbound currency examination. (*Id.* 19:20–25; 20:22.) At that point, Soto was not free to leave. (*Id.* at 24:4–6.)

Soto told Officer Mathis that she understood and spoke English. (*Id.* at 7:14–19.) Officer Mathis then informed Soto that an individual can carry any amount of money outside the United States but when that amount exceeded $10,000, it has to be reported. (*Id.* at 8:2–4.)

2

Officer Mathis also presented Soto with an English-language "Customs 0909 form." (*Id.* at 8:5–12.) Officer Ramirez repeated, in Spanish, everything Officer Mathis communicated to Soto. (*Id.* at 8:22–23.) Soto responded in English, that she understood. (*Id.* at 9:6–8.) Soto disclosed that she was carrying $1,200. (*Id.* at 9:22–24.) Officer Mathis instructed Soto to write the amount, along with Soto's signature, on the Customs 0909 Form. (*Id.* at 9:19–21; 13:3–9.)

Soto then removed $1,200 from her purse. (*Id.* at 10:1–5.) Officer Mathis examined Soto's purse for other currency and found an additional $231. (*Id.* at 10:8–11.) Officer Mathis told Soto that she was being detained by the CBP. (*Id.* at 10:20–21.) Soto was then handcuffed and escorted to CBP offices located in a building adjacent to the airport. (*Id.* at 10:23–25; 11:1–5.)

### b. CBP office examination

At about 10:15 a.m., Jeff Weeks, of the Immigration Customs Enforcement Bulk Cash Smuggling Center, called SA DeLisio. (*Id.* at 67:1–2; 69:2.) Weeks informed SA DeLisio that the TSA had detected currency in excess of $10,000 in baggage belonging to Soto. (*Id.* at 69:3–6.) SA DeLisio was subsequently informed by CBP that a seizure had been made. (*Id.* at 69:11–12.)

Shortly after 11:00 a.m., SA DeLisio, along with four other special agents went to the CBP office where Soto was detained. (*Id.* at 38:16–24.) SA DeLisio met Soto in the CBP's outbound currency team room, which consists of a long, narrow office. (*Id.* at 39:2–5.) Soto was handcuffed to a bench. (*Id.* at 39:20–21.)

SA DeLisio removed Soto's handcuffs and sat next to her on the bench, accompanied by Agent Shields. (*Id.* at 41:4–6.) Soto advised SA DeLisio that Soto could not read English or Spanish well. (*Id.* at 55:5–13.) SA DeLisio went over a statement of rights form, line by line,

3

and, at the end of each line, asked Soto if she understood. (*Id.* at 41:12–16.) The statement of rights form discusses one's *Miranda* rights, including the right to remain silent, to have an attorney present during questioning and to waive any of the aforementioned rights. (*Id.* at 41:11–20.) Soto signed the form at approximately 11:32 a.m. (*Id.*) The form was also signed by SA DeLisio and Agent Shields. (*Id.* at 44:21–23.) SA DeLisio, along with Agent Shields, then interviewed Soto in the CBP break room in order to avoid the noise of currency processing being conducted by other CBP agents. (*Id.* at 45:1.) The interview was conducted entirely in English. (*Id.* at 47:1–2.) Soto's interview lasted for approximately one and a half hours. (*Id.* at 46:1.) Soto was arrested at approximately 2:15 p.m. (*Id.* at 46:15–16.)

Subsequently, Soto signed two other forms, waiving her right to a speedy arraignment and consenting to a search of her apartment. (*Id.* at 47:3–9; 50:9–24.) In accordance with his general practices, SA DeLisio read each form to Soto. (*Id.* at 48:24–25; 50:17–18.) With respect to the waiver of speedy arraignment form, SA DeLisio explained to Soto that when someone is arrested on federal charges, they have a right to be presented to a United States magistrate judge and at that point the judge would read the charges and determine if the arrestee would be released on bail. (*Id.* at 64:15–19.) He further stated that because Soto had agreed to cooperate, her appearance before the magistrate judge would be delayed and such delay required her to sign the form indicating that she understood. (*Id.* at 64:19–65:1.) SA DeLisio also read the form to Soto line by line and explained that she could refuse to sign. (*Id.* at 65:2–6.)

With respect to the consent to search form, SA DeLisio told Soto that agents from his group would like to search her apartment to verify her interview responses and in order to complete the search, she had to sign an authorization form. (*Id.* at 63:18–23.) SA Delisio read the form line by line and verbally confirmed that Soto understood her rights. (*Id.* at 63:24–64:3.)

SA DeLisio also explained to Soto that she could refuse to sign the form, and that even at her apartment, she could revoke consent at any point. (*Id.* at 64:4–10.)

Soto had in her possession various documents, some in English and others in Spanish. (*Id.* at 51:7–11.) An imaging of Soto's cellular telephone revealed 2,103 text messages, over 90% of which were in English. (*Id.* at 53:14–19.) Similarly, Soto's cellular telephone contained approximately 494 multimedia messages, about 90% of which were in English. (*Id.* at 54:13–19.)

## II. Discussion

### a. Statements made on the jetway are admissible

Soto argues that she was subject to a custodial interrogation on the jetway and therefore her statements, prior to *Miranda* warnings, are inadmissible. The government argues that Soto was not subject to a custodial interrogation and therefore *Miranda* warnings were unnecessary. The Court agrees that Soto was not subject to custodial interrogation in the jetway.

"In *Miranda v. Arizona*, the Supreme Court held that the 'in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). As a procedural safeguard, the Supreme Court established the now familiar *Miranda* warnings, which it believed necessary "to secure the privilege against self-incrimination." *Donelli*, 588 F.3d at 154 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)). However, "[a]n interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings [only] when the interaction becomes a 'custodial interrogation.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir.

2011); *Donelli*, 588 F.3d at 155 ("*Miranda*'s warning requirements, however, apply only to 'custodial interrogation.'" (quoting *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004))).

Determining custodial interrogation involves "two parts: (a) there must be an interrogation of the defendant, and (b) it must be while she is in 'custody.'" *FNU LNU*, 653 F.3d at 148 (citing *Cruz v. Miller*, 255 F.3d 77, 80–81 (2d Cir. 2001)). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Acosta v. Artuz*, 575 F.3d 177, 189 (2d Cir. 2009) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "[T]he overarching 'custody' question is whether 'a reasonable [person] in the suspect's position would have understood' herself to be 'subjected to restraints comparable to those associated with a formal arrest.'" *FNU LNU*, 653 F.3d at 153 (alterations in original) (quoting *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (per curiam)). In assessing whether one was in "custody," courts examine the totality of the circumstances, including "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (citations omitted). Also, an additional relevant factor, "and especially so in border situations, [is] the nature of the questions asked." *Id.* (citing *United States v. Galloway*, 316 F.3d 624, 631 (6th Cir. 2003)).

As an initial matter, it is clear that Soto was not free to leave during her questioning on the jetway. (Tr. 24:4–6 ("Q was [Soto] in fact free to leave? A No, she was not, she was undergoing a Customs Border exam.").) However, this speaks only to Soto's seizure. "[N]ot

6

every seizure constitutes custody for purposes of *Miranda*." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004); *see also FNU LNU*, 653 F.3d at 153; *United States v. Casanova*, No. 11-CR-562, 2012 WL 760308, at *2 (S.D.N.Y. Mar. 8, 2012). The operative inquiry then becomes whether Soto was in "custody," stated otherwise, whether a reasonable person in Soto's position would have considered herself subject to restraints similar to those of a formal arrest.

Several factors weigh against the conclusion that Soto was in custody when questioned by Officer Mathis and Officer Ramirez. Here, the location of the questioning is particularly important. The Second Circuit has stated that upon arrival at a United States airport, every traveler "has voluntarily submitted to some degree of confinement and restraint by approaching the border, a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on." *FNU LNU*, 653 F.3d at 153–54. The Second Circuit in *FNU LNU* discussed this expectation of "constraints and questions" in the context of an individual *arriving* at a United States airport. However, a similar expectation attaches to an individual *departing* from a United States airport as well. *Cf. Corbett v. Transp. Sec. Admin.*, --- F. App'x ---, 2014 WL 2503772, at *1 (11th Cir. June 4, 2014) ("Before boarding commercial flights at U.S. airports, all passengers must submit to screening of their persons and luggage at a security checkpoint." (citing 49 U.S.C. § 44901)); *United States v. Roberts*, 274 F.3d 1007, 1013 (5th Cir. 2001) ("We note that both incoming and outgoing border searches have several features in common; for example, the government is interested in protecting some interest of United States citizens, there is a likelihood of smuggling attempts at the border, and the individual is on notice that his privacy may be invaded when he crosses the border." (quoting *United States v. Berisha*, 925 F.2d 791, 795 (5th Cir. 1991))); *United States v. Stanley*, 545 F.2d 661, 667 (9th Cir. 1976) (noting, in the context of a border

7

search absent a warrant and probable cause, that an individual departing the United States is "on notice that a search may be made, and his privacy is arguably less invaded by such search"). Any frequent traveler can attest to the expectation of questions concerning identity, baggage and security and the accompanying constraints, including physical searching of the person or baggage. With these expectations in mind, the likelihood that a reasonable person being questioned by CBP officers on a jetway would consider himself or herself under arrest is diminished, but of course still possible. *Cf. United States v. Bibian*, 48 F.3d 1229, 1995 WL 74760, at *2 (9th Cir. Feb. 22, 1995) (identifying the jetway as "the last opportunity for customs inspections").

Beyond the general location, Soto interacted with Officer Mathis and Officer Ramirez without being physically restrained, the officers' firearms were not displayed or visible and there is no evidence in the record that the officers' body language or tone was of an aggressive or intimidating nature. With respect to the nature of the questioning, which the Second Circuit has emphasized as especially relevant in border searches, Soto was told that she would be undergoing an outbound currency exam. The information Officer Mathis conveyed to Soto, and the questions Officer Mathis asked Soto, all comported with what one might expect after being told that they would be undergoing such an exam. *See FNU LNU*, 653 F.3d at 154 ("[T]he fact that the questions asked fall within the range of inquiries one expects will, by itself, be enough to assure a reasonable person that he or she is not under arrest.") Specifically, Officer Mathis told Soto that she could carry any amount of currency outside of the United States but had to report that amount if it exceeded $10,000 and asked Soto how much money she was then carrying.

On the other hand, some features of the jetway exchange do suggest that it was of a custodial nature. Of particular note, Officer Mathis asked Soto to indicate the amount of

currency she was carrying on the Customs 0909 form, and to confirm that amount with her signature. The Customs 0909 form is an informational document without any blank areas designed to be completed or signed, thus, being asked by a CBP officer to write information on such a form would raise the suspicions of an ordinary traveler. In addition, the interaction between Officer Mathis and Soto was elevated when Officer Mathis searched Soto's purse. However, a search of one's belongings arguably comports with one's reasonable expectations of an outbound currency exam, and such searches are provided for by statute. 31 U.S.C. § 5317 ("For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant . . . any envelope or other container, and any person entering or departing from the United States.").

Soto seems to argue that, because she was a person of interest upon TSA's detection of the currency anomaly in her checked luggage, and was actively sought out from amongst the passengers boarding the plane, the jetway questioning was not a routine outbound currency examination but a "ruse" meant to elicit an incriminating statement. (Def. Supp. Mot. 5.) Soto's argument, to the extent that it implicates the custody prong rather than the interrogation prong of "custodial interrogation," appears to place dispositive importance on the existence of reasonable suspicion or probable cause that she had committed a currency reporting violation. However, the Supreme Court has rejected probable cause "as the dividing line because probable cause rests, in part, on what the officer knows but the suspect may not, making it subjective, and because '[t]he threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions.'" *FNU LNU*, 653 F.3d at 151 (alteration in original) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 435 n.22 (1984)); *see also United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001) ("Although the existence or non-

existence of probable cause might be one factor to consider in determining someone's custodial status in the twilight zone between detention and custody, what ultimately matters to the determination of whether *Miranda* is triggered is *custody*, which is determined not by the existence of probable cause, but by looking to the 'objective circumstances of the interrogation.'" (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994))); *cf. United States v. Padilla*, No. 04-CR-60001, 2006 WL 3678567, at *4 (S.D. Fla. Nov. 17, 2006) (finding that "[s]ince the objective [custody] test is not premised on a fully informed declarant, the interrogating agent was under no duty to inform [the defendant] . . . of his particular interest in speaking with [the defendant]"), *aff'd sub nom. United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011). Moreover, the fact that Soto was approached on the jetway rather than at a more formal screening area, and pulled aside from other passengers, does not persuade the Court that the search was not "routine." *See United States v. Gomez Londono*, 553 F.2d 805, 809 (2d Cir. 1977) (finding that the defendant was not in "custody" when stopped and questioned, based on reliable information provided by an informant, by Drug Enforcement Agency agents at the "departure area" of Avianca Airlines at John F. Kennedy Airport); *but see United States v. Cohen*, 372 F. Supp. 2d 340, 350 (E.D.N.Y. 2005) (finding that a defendant questioned on a jetway, after being removed from his seat and escorted off his plane, was in "custody" for purposes of *Miranda*).

In sum, although some factors weigh in favor of finding the jetway exchange to be custodial, under the totality of the circumstances, the Court finds that Soto was not in "custody" and therefore, no *Miranda* warnings were required and Soto's motion to suppress her pre-arrest statements is denied.

### b. Statements made at Soto's apartment are admissible

Soto alleges that she cannot read English and thus her signing of the English-language consent to search form was not knowingly and voluntarily given, and all statements made pursuant to that search are inadmissible as "fruit of the poisonous tree." (Def. Supp. Mot. 6.) The Government argues that Soto's consent was voluntarily executed.

"Consent to a search, constituting a waiver of Fourth Amendment rights, must be voluntary." *United States v. Simmons*, 661 F.3d 151, 158 n.3 (2d Cir. 2011). "[W]hen, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006). In assessing voluntariness, district courts are to bear in mind the "totality of the circumstances," *id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 227 (1973)), including "both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 227.

SA DeLisio testified that he explained and read, line by line, the consent to search form to Soto. Soto claims that "[a]t no time . . . did any person verbally explain my rights to me."[2] (Soto Aff. ¶ 7.) The verbal explanation and reading is of special importance here as Soto has a limited ability to understand written English. *See United States v. Garcia*, No. 09-CR-330, 2011 WL 6010296, at *7 (E.D.N.Y. Nov. 30, 2011) (noting that, in assessing the voluntariness of a confession, "[a] language barrier is another factor the court should consider when determining the validity of a waiver" (citing *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985))). Soto urges the Court to find that SA DeLisio's testimony, with respect to his

---

[2] This statement explicitly referenced the allegation that Soto was not read her *Miranda* rights. (*See* Soto Aff. ¶¶ 4–7.) Because Soto presents no other evidence, the Court liberally reads her affidavit to allege that no rights were explained to her, including her Fourth Amendment right to withhold consent to a search of her apartment.

11

reading of the consent form, is not credible. The Court declines to do so and instead finds that, more likely than not, SA Delisio did verbally explain and read the consent to search form. *See United States v. Yong Wang*, No. 11-CR-730, 2013 WL 452215, at *7 (S.D.N.Y. Feb. 5, 2013) (affording testimony subject to cross-examination more weight than the defendant's sworn statement); *United States v. Robles*, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) (noting that courts may give greater weight to testimony than sworn statements). In addition, the consent to search form was not passively executed with a simple signature. Rather, Soto printed and signed her name, indicated "my apartment" as the place to be searched and denoted the address of her apartment as well as the date and time. (Tr. 63:24–25; Gov. Ex. 4.) Furthermore, Soto was interviewed in a break room away from noise, she was not handcuffed for the majority of the interview and there is no evidence in the record that any force, whether verbal or physical, was used by the interviewing agents. Upon an assessment of the totality of the circumstances, including the Court's finding that SA DeLisio read and explained the search form to Soto, the government has met its burden of showing by the preponderance of the evidence that Soto's consent to the search of her apartment was voluntary. Having decided that Soto's consent was valid, Soto's claim that her statements at her apartment were "fruit of the poisonous tree" lacks merit and is denied.

## III. Conclusion

For the foregoing reasons, the Court denies Soto's motion in its entirety.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: July 24, 2014
      Brooklyn, New York